## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------- X
|  |  |
| *In re* | : | Chapter 11 |
|  | : |  |
| Overseas Shipholding Group, Inc., *et al.*, | : | Case No. 12-20000 (PJW) |
|  | : |  |
| Debtors.[1] | : | Jointly Administered |
|  | : |  |
|  | : | **Hearing Date: February 3, 2014 at 2:00 p.m. (ET)** |
|  | : | **Objections Due: January 27, 2014 at 4:00 p.m. (ET)** |
---------------------------------------------------- X

## DEBTORS' MOTION FOR ORDER (A)(I) AUTHORIZING AND APPROVING SALE PROCEDURES; (II) AUTHORIZING AND APPROVING FORM AND MANNER OF NOTICE AND (B) AUTHORIZING AND APPROVING SALE OF CERTAIN OF THE DEBTORS' ASSETS, INCLUDING THE *OVERSEAS BERYL*, FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES

Debtor Fourth Aframax Tanker Corporation (the "Debtor Seller") together with its above-captioned affiliates (collectively, with the Debtor Seller, the "Debtors"), as debtors and debtors in possession, hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A (the "Order") pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (a)(i) authorizing and approving the sale procedures (the "Sale

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Overseas Shipholding Group, Inc. (7623); OSG International, Inc. (7117); OSG Bulk Ships, Inc. (2600); 1372 Tanker Corporation (4526); Africa Tanker Corporation (9119); Alcesmar Limited (5306); Alcmar Limited (5307); Alpha Suezmax Corporation (1684); Alpha Tanker Corporation (6063); Amalia Product Corporation (3808); Ambermar Product Carrier Corporation (8898); Ambermar Tanker Corporation (7100); Andromar Limited (5312); Antigmar Limited (5303); Aqua Tanker Corporation (7408); Aquarius Tanker Corporation (9161); Ariadmar Limited (5301); Aspro Tanker Corporation (4152); Atalmar Limited (5314); Athens Product Tanker Corporation (9565); Atlas Chartering Corporation (8720); Aurora Shipping Corporation (5649); Avila Tanker Corporation (4155); Batangas Tanker Corporation (8208); Beta Aframax Corporation (9893); Brooklyn Product Tanker Corporation (2097); Cabo Hellas Limited (5299); Cabo Sounion Limited (5296); Caribbean Tanker Corporation (6614); Carina Tanker Corporation (9568); Carl Product Corporation (3807); Concept Tanker Corporation (9150); Crown Tanker Corporation (6059); Delphina Tanker Corporation (3859); Delta Aframax Corporation (9892); DHT Ania Aframax Corp. (9134); DHT Ann VLCC Corp. (9120); DHT Cathy Aframax Corp. (9142); DHT Chris VLCC Corp. (9122); DHT Rebecca Aframax Corp. (9143); DHT Regal Unity VLCC Corp. (9127); DHT

Procedures") set forth herein in connection with the proposed sale (the "Transaction" or "Sale")

of the Debtors' rights, titles, and interests in the OVERSEAS BERYL (the "Asset"), and

(ii) authorizing and approving the form of Sale Procedure Notice attached hereto as Exhibit B,

and the manner of solicitation of bids and notice of the Sale (collectively, the "Notice

Procedures"); and (b) authorizing and approving the Sale of the Asset to a successful bidder, free

---

Sophie Aframax Corp. (9138); Dignity Chartering Corporation (6961); Edindun Shipping Corporation (6412); Eighth Aframax Tanker Corporation (8100); Epsilon Aframax Corporation (9895); First Chemical Carrier Corporation (2955); First LPG Tanker Corporation (9757); First Union Tanker Corporation (4555); Fourth Aframax Tanker Corporation (3887); Front President Inc. (1687); Goldmar Limited (0772); GPC Aframax Corporation (6064); Grace Chartering Corporation (2876); International Seaways, Inc. (5624); Jademar Limited (7939); Joyce Car Carrier Corporation (1737); Juneau Tanker Corporation (2863); Kimolos Tanker Corporation (3005); Kythnos Chartering Corporation (3263); Leo Tanker Corporation (9159); Leyte Product Tanker Corporation (9564); Limar Charter Corporation (9567); Luxmar Product Tanker Corporation (3136); Luxmar Tanker LLC (4675); Majestic Tankers Corporation (6635); Maple Tanker Corporation (5229); Maremar Product Tanker Corporation (3097); Maremar Tanker LLC (4702); Marilyn Vessel Corporation (9927); Maritrans General Partner Inc. (8169); Maritrans Operating Company L.P. (0496); Milos Product Tanker Corporation (9563); Mindanao Tanker Corporation (8192); Mykonos Tanker LLC (8649); Nedimar Charter Corporation (9566); Oak Tanker Corporation (5234); Ocean Bulk Ships, Inc. (6064); Oceania Tanker Corporation (9164); OSG 192 LLC (7638); OSG 209 LLC (7521); OSG 214 LLC (7645); OSG 215 Corporation (7807); OSG 242 LLC (8002); OSG 243 LLC (7647); OSG 244 LLC (3601); OSG 252 LLC (7501); OSG 254 LLC (7495); OSG 300 LLC (3602); OSG 400 LLC (7499); OSG America LLC (2935); OSG America L.P. (2936); OSG America Operating Company LLC (5493); OSG Car Carriers, Inc. (1608); OSG Clean Products International, Inc. (6056); OSG Columbia LLC (7528); OSG Constitution LLC (8003); OSG Courageous LLC (2871); OSG Delaware Bay Lightering LLC (4998); OSG Discovery LLC (8902); OSG Endeavor LLC (5138); OSG Endurance LLC (2876); OSG Enterprise LLC (3604); OSG Financial Corp. (8639); OSG Freedom LLC (3599); OSG Honour LLC (7641); OSG Independence LLC (7296); OSG Intrepid LLC (7294); OSG Liberty LLC (7530); OSG Lightering Acquisition Corporation (N/A); OSG Lightering LLC (0553); OSG Lightering Solutions LLC (5698); OSG Mariner LLC (0509); OSG Maritrans Parent LLC (3903); OSG Navigator LLC (7524); OSG New York, Inc. (4493); OSG Product Tankers AVTC, LLC (0001); OSG Product Tankers I, LLC (8236); OSG Product Tankers II, LLC (8114); OSG Product Tankers, LLC (8347); OSG Product Tankers Member LLC (4705); OSG Quest LLC (1964); OSG Seafarer LLC (7498);OSG Ship Management, Inc. (9004); OSG Valour Inc. (7765); Overseas Allegiance Corporation (7820); Overseas Anacortes LLC (5515); Overseas Boston LLC (3665); Overseas Diligence LLC (6681); Overseas Galena Bay LLC (6676); Overseas Houston LLC (3662); Overseas Integrity LLC (6682); Overseas Long Beach LLC (0724); Overseas Los Angeles LLC (5448); Overseas Martinez LLC (0729); Overseas New Orleans LLC (6680); Overseas New York LLC (0728); Overseas Nikiski LLC (5519); Overseas Perseverance Corporation (7817); Overseas Philadelphia LLC (7993); Overseas Puget Sound LLC (7998); Overseas Sea Swift Corporation (2868); Overseas Shipping (GR) Ltd. (5454); Overseas ST Holding LLC (0011); Overseas Tampa LLC (3656); Overseas Texas City LLC (5520); Pearlmar Limited (7140); Petromar Limited (7138); Pisces Tanker Corporation (6060); Polaris Tanker Corporation (6062); Queens Product Tanker Corporation (2093); Reymar Limited (7131); Rich Tanker Corporation (9147); Rimar Chartering Corporation (9346); Rosalyn Tanker Corporation (4557); Rosemar Limited (7974); Rubymar Limited (0767); Sakura Transport Corp. (5625); Samar Product Tanker Corporation (9570); Santorini Tanker LLC (0791); Serifos Tanker Corporation (3004); Seventh Aframax Tanker Corporation (4558); Shirley Tanker SRL (3551); Sifnos Tanker Corporation (3006); Silvermar Limited (0766); Sixth Aframax Tanker Corporation (4523); Skopelos Product Tanker Corporation (9762); Star Chartering Corporation (2877); Suezmax International Agencies, Inc. (4053); Talara Chartering Corporation (3744); Third United Shipping Corporation (5622); Tokyo Transport Corp. (5626); Transbulk Carriers, Inc. (6070); Troy Chartering Corporation (3742); Troy Product Tanker Corporation (6969); Urban Tanker Corporation (9153); Vega Tanker Corporation (3860); View Tanker Corporation (9156); Vivian Tankships Corporation (7542); Vulpecula Chartering Corporation (8718); Wind Aframax Tanker Corporation (9562).  The mailing address of the Debtors is:  1301 Avenue of the Americas, 42nd Floor, New York, NY 10019.

and clear of all liens, claims, encumbrances, and interests, pursuant to section 363(f) of the Bankruptcy Code, except as set forth in the form agreement (the "Agreement") attached hereto as Exhibit C or as otherwise stated in the Agreement to be executed with the successful bidder; and (c) granting them such other and further relief as the Court deems just and proper.  In support of the Motion, the Debtor Seller relies on the declaration of Lois K. Zabrocky (the "Zabrocky Declaration"), attached hereto as Exhibit D.  In further support of this Motion, the Debtor Seller respectfully represents as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105 and 363 of the Bankruptcy Code, as supplemented by Bankruptcy Rule 6004 and Local Rule 6004-1.

## Background

**A.     Introduction**

3.      On November 14, 2012 (the "Petition Date"), Overseas Shipholding Group, Inc. ("OSG") and its affiliated Debtors, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in the Debtors' cases [D.I. 97].

B.    **The Asset**

5.    As set forth in the Zabrocky Declaration, the Asset is an AFRAMAX-class vessel intended for the use of transportation of crude oil and like materials. Such vessels have an expected useful lifespan for this purpose of approximately twenty to twenty-five years. After this, it is customary to use the vessel as a stationary storage container, convert the vessel to use for purposes other than carrying crude oil or refined products, or else sell the vessel for its scrap value.

6.    During the time such vessels are used for transporting crude oil, they are required to maintain certifications as to their seaworthiness and construction. The certification process includes regular maintenance and inspection, and periodic visits to a dry dock for more complete repair work. As can be expected, the costs to maintain, repair, and operate such vessels generally increase over the expected usable life of the vessel.

7.    While the Asset has been well maintained and has the capability to continue to operate, the Debtor Seller has determined that the Asset does not suit its business plans and is unnecessary for the Debtor Seller's ongoing operations. Moreover, the Debtor Seller will incur increased maintenance, repair, and operational costs to maintain the Asset to the Debtor Seller's standards. Importantly, this Asset will require a mandatory fourth special survey/dry dock repair in order to remain certified in class after May 2014. The estimated cost of such a procedure is approximately $3 million.

8.    In addition to the upcoming $3 million in costs attendant to certify the Asset, the Debtors face the obstacle of the impending monsoon season in South Asia. Maximizing the price received for the Asset in the South Asian scrap market requires a sale to be completed and close far enough in advance of the monsoon season to allow the eventual purchaser adequate time to process the vessel before the traditional seasonal break that occurs during the monsoon

season in the industry.  If the Sale does not close in sufficient time for the purchaser to process the vessel prior to monsoon season, the Debtor Seller would likely be forced to maintain the Asset which would require the Vessel to undergo its fourth special survey/dry dock repair.

9.      Moreover, in the past several years there has been a surplus of vessels like the Asset available in the charter market relative to the number of would-be charterers.  As a result, vessel owners face stiff competition within the charter market, and significant downward pressure on revenues realized through chartering.  This is because, generally speaking, charterers prefer to engage newer ships when given the choice, and the relative surplus of vessels available for charter has provided ample opportunity for charterers to exercise this preference.  The result is a reduction in the number of charterers engaging older vessels, such as the Asset, and an increase in idle time between voyages.  In addition, like other owners of certain older vessels, the Debtor Seller currently faces (and will continue to face) significant market pressure from charterers who prefer to engage newer vessels for their charters.

10.      After due consideration and given the Asset's age and condition (and facing a $3 million survey/dry dock repair process in the near term), the Debtor Seller has concluded that the best way to maximize the Asset's value is to sell it into the scrap vessel market in South Asia, where scrap values are relatively high.

**C.      The Market for the Asset**

11.      As discussed in the Zabrocky Declaration, there are a relatively limited number of parties that would have both the interest and financial capability to purchase the Asset in the scrap vessel market in South Asia.  Pertinent details of the Asset are readily ascertainable in the scrap market, and word of the Debtor Seller's offer to sell the Asset is likely to spread throughout this market quickly.  Beyond potentially interested purchasers identified through the scrap brokers that the Debtor Seller intends to contact, additional interested purchasers may

come forward on their own initiative.  Moreover, the approximate value of a vessel is readily
ascertainable by reference to the ship's size and weight and the spot scrap steel market price.
Precisely because the Asset and its scrap value are, or can easily be, known within the market,
interested purchasers are unlikely to require a stalking-horse bid to aid them in properly valuing
the Asset.  Indeed, the Debtor Seller expects all bids to be within a very narrow range.  Finally,
vessel sales within this market typically occur based on a single standardized form agreement
subject to a number of relatively standard modifications.  This greatly lowers the barrier to entry
for interested purchasers, and for the Debtor Seller to evaluate competing bids provided by such
purchasers.[2]  Moreover, it will allow the Debtor Seller to execute the sale quickly once an
acceptable bid within the very narrow expected range of value is received.  As set forth in the
Zabrocky Declaration, the Debtor Seller believes that its ability to execute an Agreement and
close a sale promptly is critical to its ability to maximize the value of the Asset.   In fact, as set
forth in the Zabrocky Declaration, the Debtor Seller believes that requiring the likely purchasers
of the Asset in the scrap market to execute an agreement and then seek Court approval (causing
an approximate 30 day delay before any possibility of closing) will likely depress the value to be
achieved through the Sale.

12.   Accordingly, the Debtor Seller proposes to offer the Asset for sale without a
traditional "stalking horse" bidder or formal auction process.  For the reasons set forth above, the
Debtor Seller believes that the scrap vessel market and the customary method for vessel sales
within this market present a compelling reason to move forward without a stalking horse bidder

---

[2]   The Debtor Seller does intend to modify the standard form to reflect a sale free and clear of liens, claims
and encumbrances in order to dispel any discomfort a potential buyer may have due the Debtor Seller's
status.

or formal auction process, while still allowing it to achieve the highest and best value for the Debtor Seller's estate.

**Relief Requested**

13.     By this Motion, the Debtor Seller seeks an order (a)(i) authorizing and approving the Sale Procedures, and (ii) authorizing and approving the Notice Procedures; (b) authorizing and approving the sale of the Debtor Seller's right, title, and interest in the Asset, in accordance with the procedures, to a successful bidder free and clear of all liens, claims, encumbrances, and interests except as set forth in the Agreement or as otherwise stated in the Agreement to be executed with the successful bidder without the need for a further hearing; and (c) granting the Debtors such other and further relief as the Court deems just and proper.

**A.      The Sale Procedures**

14.     The Debtor Seller believes that a sale pursuant to the Sale Procedures described below will provide the best opportunity to maximize the value of the Asset.

15.     The material provisions of the Sale Procedures the Debtor Seller proposes are:[3]

1.      Description of Assets To Be Sold

The Debtor Seller intends to offer for sale the OVERSEAS BERYL (the "Asset").

2.      Communication with Potentially Interested Parties

The Debtor Seller will contact, either directly or through appropriate intermediaries, parties who are known in the international shipping industry to have an interest in acquiring vessels similar to the Asset for scrap to invite them to participate in the sale process. The Debtor Seller may also contact such other or additional potential interested parties, including but not limited to brokers, to invite them to participate in the sale process as well. The Debtor Seller will also entertain unsolicited requests from qualified persons to participate in the sale process.

---

[3]     These provisions set forth herein are provided pursuant to Local Rule 6004-1, and are for informational purposes only. To the extent any provision set forth within this Motion differs in any way from the Sale Procedures, the latter shall control.

3.      Due Diligence

Upon request from any person or entity that the Debtor Seller determines, in its reasonable business judgment, is likely to submit a qualified bid (a "Qualified Bidder"), the Debtor Seller may provide such Qualified Bidder with certain information regarding the Asset.

Due diligence access may include a preliminary physical inspection of the Asset and such other matters as may be reasonably requested by a Qualified Bidder prior to the Bid Deadline and as to which the Debtor Seller, in its reasonable business judgment, may agree.  For those Qualified Bidders whose bid is submitted by the Bid Deadline (as defined below), no due diligence will continue after such Bid Deadline.  The Debtor Seller may, in its sole discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at a preliminary physical inspection.  The Debtor Seller makes no representation or warranty as to the information to be provided through this due diligence process or otherwise.

For the avoidance of doubt, "due diligence" as used throughout these Sale Procedures does not mean a physical inspection of the Asset to be conducted by the Successful Bidder (as defined below) after the Bid Deadline.

4.      Bid Deadline

A Qualified Bidder who desires to make a bid will deliver written copies of its bid so as to be actually received no later than February 21, 2014 (the "Bid Deadline") by the following party:

> Fourth Aframax Tanker Corporation
> c/o Overseas Shipholding Group Inc.
> Attn: Derek Solon
> 1301 Avenue of the Americas, 42nd Floor, New York, NY 10019
> Facsimile: (212) 578-1991

Promptly following receipt, the Debtor Seller shall share all such bids with the Debtors' counsel and counsel to the Committee.

The Debtor Seller, after consultation with the Committee, may extend the Bid Deadline once or successively, but is not obligated to do so.  If the Debtor Seller extends the Bid Deadline, it will promptly notify all Qualified Bidders and the Committee of such extension.

5.      Qualified Bid

A submitted bid shall be considered a "Qualified Bid" only if it complies with the requirements of this section and is submitted by a Qualified Bidder in the manner set forth in the previous section.

A Qualified Bid must:

(a)     include a copy of the Agreement, reflecting the Qualified Bidder's proposed amendments and modifications thereto, if any, together with any exhibits and schedules to the Agreement (or term sheets that describe the material terms and

provisions of such agreement) and copies of such materials marked to show such amendments and modifications to the Agreement (the "Marked Agreement");

(b)     state, expressed in U.S. Dollars, the purchase price for the Asset (the "Purchase Price") , which must be in line with prevailing steel prices; the amount of commission to be paid to a broker, if any (the "Broker Commission"); and the amount of the address commission to be paid, if any (the "Address Commission");

(c)     not be conditioned on (1) the outcome of unperformed due diligence by the Qualified Bidder and/or (2) obtaining financing;

(d)     fully disclose the identity of each entity, including any affiliation or association with a sanctioned country, that will be purchasing the Asset and the identity of the guarantor, if any, of such entities' obligation;

(e)     state the proposed terms for acceptable delivery of the Asset including (1) the geographic location, or range of locations; and (2) the range of delivery dates;

(f)     include an acknowledgement and representation that the Qualified Bidder is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(g)     include an acknowledgement that, if selected as the Successful Bidder(s) (as defined below), the Qualified Bidder is able and willing to transmit a deposit in accordance with these procedures;

(h)     contain other information reasonably requested by the Debtor Sellers;

(i)     include the obligation to provide a 20% deposit within (3) business days of execution; and

(j)     be actually received by the Bid Deadline.

The Debtor Seller will determine, in its reasonable business judgment, after consultation with the Committee, whether to entertain bids for the Asset that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.

The Debtor Seller, after consultation with the Committee, shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

6.     Evaluation of Competing Bids

A Qualified Bid will be evaluated by the Debtor Seller (in consultation with the Committee) based upon several factors including, without limitation, items such as the Purchase Price, Broker Commission, and Address Commission provided by such bid; the identities of the purchasing entities; the Marked Agreements; the value of the Sale; the assets included or excluded from the bid; and the likelihood and timing of consummating such Sale; and other factors affecting the speed and certainty of closure; each as determined by the Debtor Seller, in consultation with its advisors and the Committee.

Following its review of the Qualified Bids and in consultation with its advisors and the Committee, the Debtor Seller reserves the right, in its sole discretion, to: (i) negotiate the terms and conditions of one or more Qualified Bids, with or without notice to any other Qualified

Bidder(s); (ii) without further negotiation or notice to any Qualified Bidder, select one Qualified Bid; or (iii) reject all Qualified Bids and/or withdraw from sale, in whole or in part, any Asset.

### 7.    Execution of the Agreement

Upon evaluation and selection of the best Qualified Bid in accordance with Section 6, and in consultation with the Committee, the Debtor Seller shall provide notice to a Proposed Successful Bidder that it is deemed to be the "<u>Successful Bidder</u>" and their Qualified Bid deemed to be a "<u>Successful Bid</u>."  The Debtor Seller shall then promptly execute the Marked Agreement underlying the Successful Bid.

### 8.    Notice of Successful Bid and Closing of the Sale

To the extent that the Debtor Seller selects a Successful Bid, the Debtor Seller shall file a notice of the Successful Bid and Successful Bidder with the Bankruptcy Court on or before March 31, 2014.  Immediately after the filing of such notice, the Debtor Seller will close on the Sale in accordance with the terms and conditions of the applicable Marked Agreement.

For the avoidance of doubt, the Debtor Seller, in its reasonable business judgment, may consider higher or better offers for the Asset at any time through and until a closing on the sale of the Asset.

### 9.    No Qualified Bids

If the Debtor Seller does not receive any Qualified Bids, the Debtor Seller reserves the right, in consultation with its advisors and the Committee to (i) extend the deadlines set forth in the Sale Procedures without further notice, and (ii) withdraw the Asset from sale at any time and to make subsequent attempts to market the same.

### 10.    Reservation of Rights

The Debtor Seller reserves the right, after consultation with the Committee and upon notice to the Qualified Bidders, to impose additional terms and conditions and otherwise modify the Sale Procedures at any time, provided, however, that such additions or modifications shall not be inconsistent with the order approving these Sale Procedures.  The Debtor Seller further reserves the right, after consultation with the Committee, to (i) extend the deadlines set forth in the Sale Procedures without further notice; (ii) withdraw the Asset from sale at any time and make subsequent attempts to market the same; and (ii) reject all bids.

**B.    The Notice Procedures**

16.    The Debtor Seller proposes to give notice, as soon as reasonably practicable after the entry of the Order, of the Sale Procedures and the availability of the Asset for Sale (as defined below), to:  (i) the taxing authorities of the fifty states and U.S. Government, and recording offices of the Marshall Islands; (ii) certain entities having oversight of the Debtor

Seller or responsibility for certifications with respect to the Asset including the United States Coast Guard and the American Bureau of Shipping; (iii) any entity that the Debtor Seller believes, in its reasonable business judgment, is likely to participate in the bidding process and is capable of doing so; and (iv) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002. To this end, the Debtor Seller seeks the Court's approval of the Sale Procedure Notice attached hereto as Exhibit B.

## C.    The Agreement

17.    The Debtor Seller proposes, in consultation with the Committee, to offer the Asset for sale in a competitive sale process. The Debtor Seller attaches a form of Agreement as Exhibit C. Pursuant to the proposed Sale Procedures, all bids must include a Marked Agreement reflecting any changes offered by a potential buyer. The Debtor Seller further reserves the right to make changes to the Marked Agreement. Any changes to the Marked Agreement made before the Bid Deadline will be distributed to the Committee, Qualified Bidders, upon request, any potential bidder. The material provisions of the Marked Agreement include:[4]

- Encumbrances. The Debtor Seller warrants that the Vessel, at the time of delivery and following the entry of the Sale Order, will be free and clear of all liens and Claims (including all charters, encumbrances, mortgages, and maritime liens or any other debts whatsoever), other than Seller Encumbrances (as defined in the Agreement). Subject to the terms and conditions of the Agreement, the Debtor Seller shall sell, and the Buyers shall buy, the Vessel free and clear of all liens and Claims (other than Seller Encumbrances (as defined in the Agreement) and liens created by or through the Buyer or any of the Buyer's affiliates) pursuant to and to the extent provided by the Sale Order.

- Deposit. The Buyers shall pay a deposit of 20% (twenty per cent) of the gross Purchase Price within three (3) Banking Days from the execution of the Agreement. Such deposit will be placed in an escrow account, or such other account as Buyers and Sellers may agree. If the Debtor Seller fails to be ready to

---

[4]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement. Furthermore, this description is provided for informational purposes only. To the extent any provision set forth within this Motion differs in any way from the Sale Procedures, the latter shall control.

validly complete a legal transfer on the Vessel on the date stated in the Agreement, and such failure is caused by or results from the Buyers' breach of the Agreement, the Debtor Seller has the right to cancel the Agreement, in which case the deposit together with interest earned shall be released to the Debtor Seller.

- <u>Buyer Representations</u>.  The Buyer has inspected and accepted the Vessel's classification records.  The Buyer has also inspected the Vessel, and has accepted the Vessel following this inspection and the sale is outright and definite, subject only to the terms and conditions of the Agreement.

- <u>Delivery</u>.  The Vessel shall be delivered and taken over safely afloat at a safe and accessible berth or anchorage or port.  The Debtor Seller shall keep the Buyer well informed of the Vessel's itinerary and shall provide the Buyer with appropriate approximate notice and 1 day definite notice of the estimated time of arrival at the intended place of delivery.  When the Vessel is at the place of delivery and physically ready for delivery in accordance with the Agreement, the Debtor Seller shall give the Buyer a written Notice of Readiness for Delivery.

- <u>Closing</u>.  At the time of delivery the Buyer and Debtor Seller shall sign and deliver to each other a Protocol of Delivery and Acceptance confirming the date and time of delivery of the Vessel from the Debtor Seller to the Buyer.  At the time of delivery the Debtor Seller shall furnish the Buyer with delivery documents reasonably required for legal transfer of the Vessel and, if applicable, to effect the registration of the Vessel under the Buyer's intended flag and its ownership by the Buyer.

- <u>Taxes and Fees</u>.  Any taxes, fees, and expenses in connection with the purchase and registration under the Buyer's flag shall be for the Buyer's account, whereas similar charges in connection with the closing of the Debtor Seller's register shall be for the Debtor Seller's account.

- <u>Brokers</u>.  As set forth in the Sale Procedures, Debtors Seller intends to contact intermediary brokers as part of their efforts to solicit Qualified Bids.  The Debtor Seller shall pay, in consultation with the Committee, an agreed-upon Address Commission and Broker Commission that is no greater than 4% (in the aggregate) of the gross purchase price in connection with the Sale.

- <u>Conditions to the Purchase and Sale</u>.  The obligation of each of the Buyer and Debtor Seller to effect the completion of the purchase and sale of the Vessel is subject to the Order having been entered by the Bankruptcy Court and not, on delivery of the Vessel by Sellers to Buyers, having been stayed, varied or set aside.

- <u>Jury Trial Waived</u>.  Debtor Seller and Buyer waive, to the fullest extent permitted by applicable law, any right to a trial by jury in respect of any litigation directly or

indirectly arising out of, under, or in connection with the Agreement, any ancillary agreements, or any transaction contemplated hereby or thereby.

**Basis for Relief Requested**

**A.    The Sale Procedures Are Appropriate Under the Circumstances**

18.    A debtor may sell, after notice and a hearing, assets outside the ordinary course of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.  See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); In re Integrated Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("it is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (quoting Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988))).

19.    The implementation of sale procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtor Seller submits that the opportunity for bidding and Sale embodied in the Sale Procedures will generate the highest or otherwise best offer for the Asset and therefore is designed to maximize the value of the Asset.

20.    As set forth above and in the Zabrocky Declaration, the Debtor Seller believes a prompt sale process is the best way to maximize the value of the Asset for the benefit of its estate, creditors, and other stakeholders.    Accordingly, the Debtor Seller, in its business

judgment, has concluded that the proposed Sale Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Asset.

**B.      Notice of the Proposed Sale Is Reasonable Under the Circumstances**

21.      The Debtor Seller submits that the Notice Procedures as set forth above are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Sale Procedures.  This Motion has been filed and served in accordance with Bankruptcy Rule 2002, and the Sale Procedure Notice attached hereto as Exhibit B will provide all interested parties with further notice of the Sale Procedures, the Bid Deadline, and proposed Sale of the Asset.

**C.      Sale of the Asset Is a Product of the Debtor Seller's Reasonable Business Judgment**

22.      Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

23.      A proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization should be approved if a Court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor in possession.  See In re Abbotts Dairies of Pa., 788 F.2d 143 (3d Cir. 1986); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale:  "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be

obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

24.     The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus. Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).

25.     In accordance with Bankruptcy Rule 6004, a sale of property rights outside of the ordinary course of business may be by private sale or public auction. See Fed. R. Bankr. P. 6004 ("All sales not in the ordinary course of business may be by private sale or by public auction."). As this Court has recognized, whether to proceed by public or private asset sale is committed to the sound discretion of the trustee or debtor in possession, as applicable.  See In re Alisa P'Ship, 15 B.R. 802, 802 (Bankr. D. Del. 1981).  Indeed, it has been stated that a "bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)." In re Ancor Exploration Co., 30 B.R. 802, 808 (N.D. Okla. 1983).

26.    The Sale Procedures meet the "sound business reason" test.  First, sound business purposes justify the sale.  The Debtor Seller believes that a prompt sale of the Asset conducted pursuant to the Sale Procedures presents the best opportunity to realize the maximum value of the Asset to the Debtor Seller's estate and its creditors.  The Debtor Seller further believes that the benefit to the Debtor Seller's creditors will be adversely affected absent an immediate sale because, as described above, the Asset is declining in value over time and requires substantial additional investment in the near term to remain commercially viable.  See In re Lionel Corp., 722 F.2d at 1071 (stating that of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

27.    The proposed procedures for the sale of the Asset also meet the other factors of the "sound business reason" test.  As part of this Motion, the Debtor Seller has sought to establish procedures for notice to creditors and other prospective bidders.   Under the circumstances of this case, the Debtor Seller submits that the notice period proposed satisfies the requirements of the Bankruptcy Rules, see Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

28.    Finally, the Sale Procedures, which require the Debtor Seller to consult with the Committee, satisfy the good faith requirement of Abbotts Dairies.  The Debtor Seller submits that the results of the sale process will be the product of good faith, arm's length negotiations with respect to the price and other terms of the Sale between the Debtor Seller and highest and best bidder at the conclusion of the sale process.

**D.    Sale of the Assets Should Be Free and Clear of Liens, Claims, and Interests**

29.    Pursuant to section 363(f) of the Bankruptcy Code, the Debtor Seller seeks authority to sell and transfer the Debtor Seller's right, interest, and title in the Asset to the

16

Successful Bidder free and clear of all liens, claims, and interests, except as set forth in the

Marked Agreement or the Agreement executed with the Successful Bidder, with such liens,

claims, encumbrances, and interests to attach to the proceeds of the sale of the Asset, subject to

any rights and defenses of the Debtor Seller and other parties in interest with respect thereto.

Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>
> (1)      applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens on such
> property;
>
> (4)      such interest is in bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section

363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the

requirements is met).

        30.      With respect to each creditor asserting an interest in the Asset, one or more of the

standards set forth in Bankruptcy Code section 363(f)(1)-(5) will have been satisfied.  Those

holders of interests who did not object or who withdrew their objections to the Sale or the

Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code

section 363(f)(2).  Those holders of interests who did object fall within one or more of the other

subsections of Bankruptcy Code Section 363(f).  Moreover, there will be no prejudice to any

holder of any interests because their interests will immediately attach to the proceeds of any sale of the Asset.

31.    A sale free and clear of liens, claims, encumbrances, and interests is necessary to maximize the value of the Asset. A sale of the Asset other than one free and clear of all interests would yield substantially less value for the Debtor Seller's estate, with less certainty than a transaction free and clear of all interests. Therefore, the Transaction contemplated by the Agreement is in the best interests of the Debtor Seller, its estate and creditors, and all other parties in interest. A sale free and clear of liens, claims, encumbrances, and interests is particularly appropriate under the circumstances because any lien or claim in, to or against the Debtor Seller's right, interest, and title in the Asset that exists immediately prior to the closing of any sales will attach to the sale proceeds allocated to the Debtor Seller with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtor Seller or any party in interest. The Debtor Seller submits that holders of liens, claims, and interests, if any, will be adequately protected by the availability of the proceeds of the sale to satisfy their liens, claims, and interests.

**E.    Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h)**

32.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other

transaction to close immediately where there has been no objection to the procedure.  See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.  Because of the potentially diminishing value of the Asset, and given the Debtor Seller's practical need to manage the voyages and port for delivery of the Asset, the Debtor Seller must close the sale promptly after all closing conditions have been met or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

### Notice

33.     Notice of the Motion has been given via first-class mail, facsimile, electronic transmission, hand delivery, or first class mail to (i) the U.S. Trustee; (ii) counsel to the Committee, (iii) the taxing authorities of the fifty states and U.S. Government, and recording offices of the Marshall Islands; (iv) certain entities having oversight of the Debtor Seller or responsibility for certifications with respect to the Asset including the United States Coast Guard and the American Bureau of Shipping; (v) any entity that the Debtor Seller believes, in its reasonable business judgment, is likely to participate in the bidding process and is capable of doing so; and (vii) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtor Seller submits that under the circumstances no other or further notice is necessary.

### No Prior Request

34.     No prior request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: January 13, 2014          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
      Wilmington, Delaware

                                          */s/ Daniel B. Butz*
                                          Derek C. Abbott (No. 3376)
                                          Daniel B. Butz (No. 4227)
                                          William M. Alleman, Jr. (No. 5449)
                                          1201 North Market Street, 16th Floor
                                          P.O. Box 1347
                                          Wilmington, Delaware 19899-1347
                                          Telephone:  (302) 658-9200
                                          Facsimile: (302) 358-3989

                                          *Counsel for the Debtors and Debtors in Possession*

7866044.5